IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHN NIELSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-614-JHP |
| | ) | |
| RHEMA BIBLE CHURCH, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

Before the Court is Defendant Rhema Bible Church's Motion for Summary Judgment (Docket No. 30). For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

**A.  Undisputed Factual Background[1]**

Rhema Bible Church ("Rhema") is a religious not for profit corporation existing and operating in the State of Oklahoma with its church facility and corporate office located at 1005 West Kenosha, Broken Arrow, Oklahoma. Rhema operates a diverse religious ministry, including a local church, bible school, and an extremely active mission outreach. In order to effectively conduct its religious meetings and crusades, Rhema owns and operates a jet aircraft.

All Rhema employees are required to sign and abide by the Rhema Bible Church Staff commitment which requires employees: (1) to be committed members of the Rhema Bible Church,

---

[1] The Court recognizes that Nielson has submitted a "Statement of Facts Creating a Controversy"(Docket No. 40 at 3-12). However, Nielsen's statement does not create a dispute as to any material facts, as the facts he submits are either entirely consistent with Rhema's statement of facts, or are immaterial to the Court's ability to decide the case.

1

faithfully supporting its vision and programs; and (ii) to attend Rhema Bible Church services on a regular basis.

On or about September 6, 2006, Rhema and John Nielsen entered into an employment agreement ("the Employment Agreement") whereby Rhema employed Nielsen to perform the job of piloting and/or co-piloting Rhema's jet aircraft. The Employment Agreement provides that Nielsen's direct supervisor is David Fussell and Nielsen admits that he understood that his direct supervisor was Fussell. The Employment Agreement provides that Nielsen's employment with Rhema is initially a probationary term of six (6) months, which could then be extended by Rhema at its sole discretion. The Employment Agreement provides that Nielsen's employment was to be one of "employment-at-will" and that either party could terminate the employment relationship at any time and for any reason. The Employment Agreement provides that Rhema could change Nielsen's job duties at any time. The Employment Agreement provides that Nielsen was to "make himself available and on call at all times during the term of his agreement..." The Employment Agreement provides that Nielsen was to repay Rhema upon termination by Rhema "for cause" or by Nielsen for any reason, the lesser of: (1) Rhema's total training costs incurred to the date of termination or following the date of termination, or (2) $2,769 per month for each month remaining on the thirteen month period plus a prorated amount for any work days outstanding in any partial month. On or about September 8, 2006, Nielsen executed the "Rhema Bible Church Staff Commitment," which provides Nielsen was "expected to attend Rhema Bible Church services on a regular basis."

At the time of Nielsen's employment, Rhema had established certain personnel policies applicable to its employees and memorialized the same in an employee handbook. Section 40 of that

handbook, entitled "Harassment/Sexual Harassment Policies" recites Rhema's policy concerning harassment in the workplace. Rhema's Harassment Policy states that its purpose is to protect its employees and to "also identif[y] the complaint procedures available to victims..." Section 40 of the Harassment Policy requires employees to "immediately report the matter or incident to the Human Resources Office at 258-1588, ext. 2204." Further, Section 40.4 of the Harassment Policy contains a text box set apart from the text which states as follows: "NOTE: No employee or complaint will ever be subject to any form or type of retaliation or discipline for filing a harassment or sexual harassment complaint, regardless of the outcome of the investigation."

On or about September 8, 2006, Nielsen executed the Receipt Acknowledgment of Employee Handbook, which states that Nielsen had received his copy of the Employee Handbook and that he agree to familiarize himself with it and understood that it constituted the personnel policies of Rhema. Nielsen admits that no one deterred him from reading the Employee Handbook and that he understood he had made a commitment to familiarize himself with the Employee Handbook. Nielsen admits that he familiarized himself with the Employee Handbook.

Nielsen was terminated from employment with Rhema on January 5, 2007.

Nielsen alleges the claims encompassed in his lawsuit are brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. Nielsen alleges that Rhema engaged in an "illegal course of conduct which included suggestive, unwelcome, and unwanted comments of a sexual nature directed towards Plaintiff," and those allegations of sexual harassment are encompassed in "Count I" of Nielsen's Complaint. Specifically, Nielsen's allegation of sexual harassment encompassed only two occasions, both of which occurred in October 2006, and involved alleged inappropriate sexual remarks made by Fussell. Nielsen alleges the first

inappropriate sexual comment made by Fussell in Nielsen's presence was directed to Mr. Chuck Hensley in the hanger while going over the details of an upcoming flight. Nielsen alleges that Fussell stated to Hensley: "Well, one of the big perks of the job was that over at Italy, we could walk behind the Italian girls and check out their assetts." Nielsen admits that Fussell was speaking to Hensley when he made the alleged comment about Italian girls' assets and that the comment was not directed to Nielsen. Nielsen further admits that he was not asked to give any response to the Italian girls' assets comments. Nielsen admits that he found the Italian girls' assets comment "extremely inappropriate" and that it was important to him that such a comment not occur again. However, Nielsen also admits that, other than Fussell, he did not tell anyone else at Rhema about the Italian girls' assets comment or that he felt sexually harassed.

Nielsen alleges the second inappropriate sexual comment made by Fussell in Nielsen's presence was directed to the bus driver/mechanic in a rental car after a religious service. Nielsen alleges that Fussell and the bus driver/mechanic discussed "Brooke" (apparently a single woman on the praise and worship team) as follows: "Boy, she's smoking hot tonight. Yeah, built like a brick shit-house. Boy she sure would make someone a good wife. Yeah, boy, she's really looking good." Nielsen admits that: (1) Fussell was speaking to the bus driver/mechanic when he made the alleged comment about "Brooke"; (2) Nielsen did not participate in the conversation; and (3) the comment/conversation about "Brooke" was not directed to Nielsen. Further, Nielsen admits that neither person involved in the alleged conversation about "Brooke" said anything to Nielsen. Nielsen admits that he did not utilize Rhema's Harassment Policy procedures and did not tell anyone at Rhema (other than Fussell) that he felt sexually harassed about the "Brooke" conversation he overheard. Nielsen admits that: (1) he knew the Harassment Policy existed; (2) he was familiar with

4

it; (3) he understood he was to call the Human Resources Department if her were ever sexually harassed; (5) he understood that Rhema's policy was that there would be not retaliation, discipline, or harassment for filing or pursuing a harassment complaint. Nielsen admits that he did not utilize Rhema's Harassment Policy procedures and did not tell anyone within Rhema about the two alleged instances of sexual harassment. Nielsen's complaint also alleges that the two instances of sexual harassment amount to quid pro quo sexual harassment.

Nielsen alleges that Fussell gave him new job duties in the first week of December 2006 because Nielsen refused to "go along with sexual comments." Nielsen alleges Rhema retaliated against him by terminating his employment for complaining to Fussell about the two alleged instances of sexual harassment. Sometime before December 11, 2006 (before Nielsen's termination on January 5, 2007), Nielsen approached Attorney Clint Soderstrom and requested legal advice. Nielsen admits that Soderstrom indicated to him to "just put your situation on paper and go to him and he'll look it over and we'll look into it." From Rhema's offices on December 11, 2006, Nielsen sent a twelve-page facsimile to Soderstrom requesting legal advice about his situation and forwarding a copy of his "new job duties," and a copy of the Employment Agreement. On the cover page the fax, Nielsen described his complaints against Rhema as follows:

> The last two pages were given to me last week which changed my work days required and job duties. I have been given jobs previously assigned to other people. When negotiating salary, I was told I would average one week a month and was given a laptop so I could check email etc. from home. Also, when my wife took a turn for the worse on her medical condition and missed three weeks of church, I was told church services and activities are no longer expected but mandatory regardless if I want to be with my wife and I would not receive future increases in pay or bonuses if I missed church. I am searching for other employment but will be required to pay back the contract. I am now...on demand 24/7 to come to the hanger to do the most trivial of things. My family and I cannot plan anything. Thank you for your time. I look forward to hearing from you.

Nielsen says that this fax was intended to "check his rights" and ask Soderstrom "[i]s this legal?" Nielsen alleges that Rhema retaliated against him by terminating his employment for seeking legal advice from an attorney, specifically sending this fax. Nielsen alleges that Rhema also retaliated against him by terminating his employment for complaining about the requirement of his employment that he and his family attend church services and church functions.

**B.     Procedural Background**

Nielsen filed suit on October 25, 2007, alleging that Rhema violated Title VII, 42 U.S.C. § 2000e *et seq.,* and seeking compensatory damages and punitive damages. In his complaint, Nielsen claims he was the victim of sexual harassment, specifically alleging that he was subject to a hostile work environment and quid pro quo sexual harassment. Nielsen also alleges that he was terminated in retaliation for his complaining about this sexual harassment and in retaliation for his consulting of an attorney regarding his employment rights.

Rhema filed a counter-claim on March 3, 2008, alleging breach of contract and seeking re-payment of certain expenses it had incurred training Nielsen to fly Rhema's jet.

Rhema filed the instant motion for summary on July 25, 2008, arguing that both Nielsen's sexual harassment and retaliation claims fail as a matter of law. In response, Nielsen abandons his hostile work environment and quid pro quo sexual harassment claims, but argues that his two retaliation claims cannot be decided as a matter of law because of disputed material facts.

## DISCUSSION

**A.     Summary Judgment Standards**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249.

Taking those standards into consideration, Rhema is entitled to summary judgment in this case if Nelsen has failed to make a sufficient showing of an essential element of the case to which he has the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**A.     Nielsen's Title VII Retaliation Claims**

It is unlawful for an employer to take adverse employment action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a). In order to demonstrate retaliation:

> "[a] plaintiff must first establish a prima facie case of retaliation. If a prima facie case is established, then the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If evidence of a legitimate reason is produced, the plaintiff may still prevail if [h]e demonstrates the articulated reason was a mere pretext for discrimination. The overall burden of persuasion remains on the plaintiff."

*Sorensen v. City of Aurora*, 984 F.2d 349, 353 (10th Cir.1993).

"To establish a prima facie case of retaliation under Title VII, the plaintiff must show: (1) he engaged in protected opposition to statutorily prohibited discrimination or participated in a statutorily permitted proceeding, (2) the employer took adverse action contemporaneously or

subsequent to the employee's protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action." *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994)(*citing Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 634 (10th Cir.1988)).

### 1.  Nielsen's Claim of Retaliation Based on Alleged Sexual Harassment

Nielsen argues that his termination was, at least in part, retaliation for his prior complaints of exposure to what he felt were sexually offensive remarks. Nielsen argues that prior to his complaining to his direct supervisor, Chief Pilot David Fussell (the co-worker who allegedly made the remarks), about the remarks, Fussell had expressed satisfaction with Nielsen's job performance. Nielsen argues that after the complaint was made, Fussell's attitude towards him changed and Fussell eventually fired him.

Rhema argues that Nielsen has failed to establish the requisite causal connection between his complaint to Fussell and his termination. Rhema points to Nielsen's own admission that the facsimile to an attorney was the primary reason Fussell fired Nielsen as evidence that Nielsen's termination was not related to his complaints regarding Fussell's comments. Finding it to be the dispositive factor, the Court first examines whether there is a causal connection between Nielsen's complaint and his subsequent termination.

Nielsen "may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239-40 (10th Cir.2004)(quotation omitted). Nielsen points only to the temporal proximity of his complaints and subsequent termination as evidence of a causal connection (he was fired approxiately 2-3 months after complaining to Fussell).

This scant circumstantial evidence is undermined, however, by Nielsen's frank admission that he was fired not for his complaints, but because of the fax he sent to an attorney:

> Q: Are you alleging that you were religiously discriminated against?
>
> A: Yes.
>
> Q: And is that the basis for which you believe you were fired?
>
> A: Oh, no. I was fired for the fax.

(Docket No. 30-5, p. 66, lines 14-19). Additionally, when Fussell terminated Nielsen, Fussell indicated that the primary reason he was terminating Nielsen was the facsimile:

> Fussell: I guess one of the biggest things was this.
>
> Nielsen: Okay.
>
> Fussell: The fax machine. It was probably not intended for my eyes.
>
> Nielsen: Oh, I don't know. I, this is. You know. I just want to fly and do this. We are dealing with some medical things and that's it. That's all. I just want to fly.
>
> Fussell: I understand. I understand. I also understand that that's a law office. I don't know what's going on there. I do know that that is a breach of confidentiality, the training contract, what goes on here is supposed to stay here. I don't have any trust. That was a total shock finding that. I was saddened to find that. Again, I couldn't turn a blind eye to it. I don't know what's going on there. Understand that I don't have a problem with your flying. I really don't. I think you've got a lot of solid skills and stuff, but you've got to find a place where you fit in. That's what the probationary period is all about.

(Docket No. 40-12, at 4). There is simply no evidence that Nielsen's was fired because of his complaints to Fussell. And the mere fact that Nielsen was fired shortly after his complaints to Fussell does not, and cannot, create the requisite causal connection in light of Nielsen's candid admission that he was fired because of the facsimile and not because of his complaints.

9

Therefore, the Court finds that Nielsen has failed to establish a prima facie case of retaliation for complaining about remarks of a sexual nature.

### 2.     Nielsen's Claim of Retaliation Based Upon His Consulting an Attorney

Nielsen also argues that his termination was, at least in part, retaliation for his consulting an attorney regarding his rights under Title VII. Specifically, Nielsen argues that the facsimile he sent to attorney Clint Soderstrom prompted his firing. Rhema argues that the facsimile does not make any reference to Title VII and therefore did not put Rhema on notice that Nielsen was questioning his rights under Title VII. Rhema argues that because it was not aware Nielsen was consulting an attorney regarding his rights under Title VII, it could not possibly have fired him because of his consultation with an attorney regarding those rights.

The Court agrees with Rhema. In *Petersen v. Utah Dept. of Corrections,* 301 F.3d 1182 (10th Cir. 2002), the Tenth Circuit recognized that "[a]n employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Id.* at 1189. Here, the facsimile Nielsen sent to his attorney does not reference Title VII. In fact, on its face, the facsimile appears to be nothing more than the words of an employee who is unhappy with his current job duties, contemplating new employment, and trying to determine whether or not he will have to repay training expenses:

> The last two pages were given to me last week which changed my work days required and job duties. I have been given jobs previously assigned to other people. When negotiating salary, I was told I would average one week a month and was given a laptop so I could check email etc. from home. Also, when my wife took a turn for the worse on her medical condition and missed three weeks of church, I was told church services and activities are no longer expected but mandatory regardless if I want to be with my wife and I would not receive future increases in pay or bonuses if I missed church. I am searching for other employment but will be required to pay back the contract. I am now...on demand 24/7 to come to the hanger to do the most trivial of things. My family and I cannot plan anything. Thank you for your

time. I look forward to hearing from you.

(Docket No. 30-9). Additionally, when terminating Nielsen, Fussell referenced the facsimile, but did not reference either Title VII or discrimination in general (Docket No. 40-12, at 4). To the contrary, Fussell simply expressed his belief that Nielsen had breached a confidentiality agreement by sending portions of the handbook to an attorney:

> Fussell: I guess one of the biggest things was this.
>
> Nielsen: Okay.
>
> Fussell: The fax machine. It was probably not intended for my eyes.
>
> Nielsen: Oh, I don't know. I, this is. You know. I just want to fly and do this. We are dealing with some medical things and that's it. That's all. I just want to fly.
>
> Fussell: I understand. I understand. I also understand that that's a law office. I don't know what's going on there. I do know that that is a breach of confidentiality, the training contract, what goes on here is supposed to stay here. I don't have any trust. That was a total shock finding that. I was saddened to find that. Again, I couldn't turn a blind eye to it. I don't know what's going on there. Understand that I don't have a problem with your flying. I really don't. I think you've got a lot of solid skills and stuff, but you've got to find a place where you fit in. That's what the probationary period is all about.

(*Id.*). As in *Petersen*, retaliation against Nielson would be prohibited by Title VII only if Fussell knew that Nielsen's facsimile to an attorney was motivated by Nielsen's belief that Rhema was engaging in discriminatory acts. *Petersen,* 301 F.3d at 1189. Here, there simply is no evidence that Fussell had that knowledge.

Since there is no evidence to suggest that Rhema was aware Nielsen was consulting his attorney regarding rights protected by Title VII, the Court finds that Nielsen has failed to establish a prima facie case of retaliation for consulting an attorney about rights protected by Title VII.

11

## **CONCLUSION**

For the reasons set forth above, Defendant Rhema Bible Church's Motion for Summary Judgment (Docket No. 30) is GRANTED.

*[Signature]*

James H. Payne
United States District Judge
Northern District of Oklahoma